# UNITED STATES DISTRICT COURT

for the

District of Massachusetts

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>**87 Warren Street, Randolph, MA 02368, Public Storage,<br>Unit #J021** | ) <br> ) <br> ) <br> ) <br> )     Case No.   14-CR-10304 DPW |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

87 Warren Street, Randolph, MA 02368, Public Storage, Unit #J021, as described in Attachment A hereto

located in the _____ District of _____ **Massachusetts** _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. secs 841(a)(1); 846 | Narcotics trafficking/conspiracy |
| 18 U.S.C. sec 1956 and 1957 | Money Laundering |
| 31 U.S.C. sec 5324(a)(3) | Structuring |

The application is based on these facts:

See Attached Affidavit of Special Agent Richard Atwood.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Richard Atwood, Special Agent DHS

*Printed name and title*

Sworn to before me and signed in my presence.

Date:   DEC − 5 2014

*Judge's signature*

City and state:   Boston, MA    **HON. ROBERT B. COLLINGS**
**UNITED STATES MAGISTRATE JUDGE**
United States District Court
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 7420
Boston, Massachusetts 02210

Hon. Robert B.Collings, United States Magistrate Judge

*Printed name and title*

## ATTACHMENT A

### (Description of premises to be searched)

The premises located at 87 Warren St., Unit J021, Randolph, Massachusetts, is a Public Storage Unit Facility. The single story business building is more fully described as a white building with a gated area where the outdoor storage units are located. Unit "J021" is located in the back portion of the gated area. Unit "J021" is a five foot by five foot storage unit. The numbers "21" are black in color painted on the wall, on the right side of the storage unit door. The letter "J" is also painted black in color painted to the wall at the end of the storage building. The storage unit door is tan in color and opens like a garage door.

## AFFIDAVIT OF RICHARD F. ATWOOD

I, Richard Atwood, being duly sworn, hereby depose and state the following:

## INTRODUCTION & PURPOSE OF AFFIDAVIT

### A.    Agent Background

1.    I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C.§ 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. §2516. I am also a law enforcement officer of the United States defined within the meaning of the 1930 Tariff Act, 19 U.S.C. §1589(a), and 18 U.S.C. §2510(7). I am a Special Agent with the Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), currently assigned to the Office of the Special Agent-in-Charge, Boston (SAC/BOS), Airport/Seaport Group, which is responsible for investigating violations involving contraband being imported and exported into and out of the United States. I have been employed as a Special Agent with HSI since August 2009. I have received training by HSI in the investigation of smuggled goods and/or contraband over interstate and international lines. Prior to becoming a Special Agent with HSI, I was employed as a U.S Postal Inspector, working for the United States Postal Inspection Service ("USPIS") for approximately six years. I received training by the U. S. Postal Inspection Service in the investigation of contraband, including stolen goods, narcotics, and counterfeit documents being transported through the United States mails. Prior to becoming a United States Postal Inspector, I was a Police Officer with the Phoenix Police Department for approximately four years, and a Manchester, New Hampshire Police Officer for approximately eight months. Finally, I have a Bachelor of Arts Degree in History that I received while attending Framingham State College, in Framingham, Massachusetts.

2.     In my capacity as a Special Agent/Postal Inspector for almost 12 years, I have conducted or participated in hundreds of investigations involving the illegal manufacture/ cultivation, smuggling, and distribution of controlled substances, as well as the laundering of proceeds from the sale of those illegal substances. I have appeared before US District Court Judges in the District of Massachusetts on numerous occasions to swear to affidavits in support of search, arrest, and seizure warrants pertaining to controlled substances and money laundering.

3.     I have written and/or participated in the execution of numerous search warrants resulting in the seizure of large quantities of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances; United States currency; records of narcotics and monetary transactions; and drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds. I have participated in the debriefing of numerous defendants, informants, and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations. I have participated in all aspects of drug investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants, and executing arrests. I have received extensive specialized training in the field of controlled substance identification, investigation, and enforcement.

4.     I have participated in the execution of numerous search warrants at the residences of drug-traffickers, or other secure locations under their control, such as the targets of this investigation. In a substantial number of such searches executed in connection with the drug investigations in which I have been involved, the following kinds of drug-related evidence have typically been recovered:

a.     paraphernalia for packaging, processing, diluting, weighing, and

2

distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, and heat-sealing devices;

b. books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

c. personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

d. electronic equipment such as computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and or store the information described above;

e. cash, currency, and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as precious metals such as gold and silver, and precious gems such as diamonds;

f. documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills;

g. cellular telephones.

5. In addition, during the course of such searches I have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences or other secure locations under their control, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

3

6.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia in their residences or other secure locations under their control for longer periods of time.  Further, it is generally a common practice for drug traffickers to maintain in their residences or other secure locations under their control for longer periods of time records relating to their drug trafficking activities.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.  I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences or other secure locations under their control for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

7.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for traffickers to conceal at their residences or other secure locations under their control large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances.  In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  Evidence of such financial

4

transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences or other secure locations under their control.

8.      Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking activities in safes or other containers so that other individuals who are at their residences or other secure locations under their control do not discover these materials.

9.      Based upon my involvement and the involvement of other agents in this investigation, I know that drug traffickers, such as the targets of this investigation, regularly communicate using cellular telephones. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, a cellular telephone is a handheld wireless device used for voice and text communication. Telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls and text messages made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Based on my training, experience, and research, I know that many

cellular telephones have capabilities described above. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device as well as his criminal accomplices.

10.    Based upon my training, knowledge, and experience, I know that individuals engaged in the distribution of narcotics, typically maintain financial records, ledgers, and other writings evidencing their illegal activities in safe, secure, and private places and locations like their homes, apartments, businesses, offices, vehicles, and other leased or owned locations where their privacy can be maintained. Record-keeping, in particular, is critical to such individuals to keep close track of monies paid and monies owed to stay profitable and remain in business. In addition, the records need to be maintained where they are most easily accessible and, therefore, at secure locations such as, for example, their homes and residences. Accordingly, based on my knowledge with respect to facts and circumstances in this investigation, as well as my experience and training relating to cases involving individuals distributing narcotics, as well as my discussions with other agents who investigated such cases, I know that it is a common practice for individuals engaged in these illegal activities to maintain the items and records or documents as set forth in Attachment B, which is incorporated to this affidavit by reference, whether contained on paper, in hand-written, typed, photocopied, or printed form, magnetic tape, cassettes, disks, diskettes, CDs, DVDs, thumb drives, photo-optical devices, or any other medium.

11.    More broadly, as a result of my own knowledge and experience and from consultation with senior Special Agents from the Internal Revenue Service who have been assisting in this investigation, as well as other federal and local law enforcement officers, many of whom have spent significant time investigating illegal narcotics and money laundering operations, I know the following:

6

a.      Individuals who are involved in illegal businesses such as narcotics trafficking normally do not report their illegal income on their Federal income tax returns.

b.      Drug traffickers commonly profit and amass proceeds from the sale of drugs, and they usually receive U.S. currency as proceeds from the sale of drugs. As a result, drug traffickers often maintain on hand and have quick access to large amounts of U.S. currency or other liquid assets in order to maintain and finance their ongoing operations. In order to protect their illegal activity, to avoid detection by law enforcement and suspicion by legitimate businesses, and to be able to utilize their drug profits, they attempt to disguise and legitimatize these profits through money laundering activities, often utilizing money launderers for the task. These individuals must convert their illegal cash proceeds into legitimate or more manageable forms, such as deposits to bank accounts, bank checks, cashier's checks, or money orders, in order to spend their proceeds. Or they may seek to exchange small bills for larger denominations. To accomplish these goals, money launderers and drug traffickers often utilize various types of financial institutions, including banks, securities brokers, attorneys, accountants, shell corporations, business fronts, companies offering wire transfer services, and otherwise legitimate businesses.

c.      Most legitimate businesses usually do not receive or make large payments in U.S. currency because of the problems associated with bulk currency, security of the currency from theft or loss, difficulty in making payments in currency, and lack of record keeping and receipts for currency transactions.

d.      Many individuals involved in illegal businesses are aware of Federal reporting requirements of banks and businesses to report cash transactions over $10,000. Individuals who profit from illegal businesses find it difficult to spend their proceeds without detection by law enforcement in part because of the reporting requirements. They take steps to

7

avoid the reporting requirements, such as: structuring cash deposits into bank accounts in amounts of less than $10,000; making cash deposits into several different bank accounts or at several different branch locations of less than $10,000 each; and/or making cash deposits into bank accounts on successive days of less than $10,000 each.

        e.      Individuals involved in illegal businesses often purchase money orders, bank checks, traveler's checks, or other financial instruments with their cash proceeds in amounts of less than $10,000.

        f.      Individuals involved in illegal businesses often make use of nominees in order to conceal their ownership of, control over, or relationship to assets, residences, and other items associated with their illegal activities. They place assets, bank accounts, real estate, and businesses in the name of these nominee individuals or entities even though they are the true owners.

        g.      Individuals involveed in illegal businesses often set up shell corporations and partnerships that have little or no legitimate business; instead, their main purpose is to disguise the proceeds of the illegal business.

        h.      Individuals involved in illegal businesses often set up numerous financial accounts in their name, in the name of nominees, and in the name of shell corporations or partnerships. The purpose of these financial accounts is to hide proceeds of the illegal business by shifting the proceeds around through several accounts at several financial institutions in several different names. This layering of financial transactions is done in an attempt to thwart law enforcement efforts to trace the money to its original source and true owner.

      12.      I have participated in this investigation for approximately the last thirty one months with the assistance of agents from the Internal Revenue Service, Massachusetts State Police, Drug Enforcement Administration, Postal Inspection Service, Boston Police Department,

and Norwood Police Department. Based upon my experience with this and other narcotics and financial and money laundering investigations, combined with the knowledge and information concerning money laundering and financial transactions, I know that drug distribution and its related money laundering activities produce and require records indicative of those individuals involved in such conspiracies, as well as records relating to the acquisition and disposition of illegal proceeds, and that they commonly maintain such records and evidence where they have ready access to them, including but not limited to their homes, offices, automobiles, "stash houses," and storage places. Further and more particularly, I know the following:

a. When money launderers and drug traffickers succeed in laundering their drug proceeds through financial institutions, it is common that the laundered funds will go undetected in the banking and law enforcement community because these funds will have the inherent appearance of being from a legitimate source.

b. Money launderers and drug traffickers often attempt to engage in legitimate businesses. However, these businesses are commonly nothing more than "fronts" to launder drug proceeds. The business front provides a means for the drug dealer to show that he/she has legitimate income, when in fact the income is solely from the sale of drugs.

c. Money launderers and drug traffickers often purchase and/or title assets, including residences and vehicles bought with drug and money laundering proceeds, in fictitious names, aliases, names of relatives, associates, or business entities, whose sole purpose is that of a "nominee" title holder while the traffickers and launderers actually own and continue to use the assets and exercise dominion and control over the assets.

d. Money launderers and drug traffickers often maintain a good credit record so that if they purchase assets in their own name, they can combine their illegal proceeds with loan proceeds to purchase the asset, which gives the appearance that the assets were purchased

9

with legitimate, borrowed money. This also allows the trafficker or launderer to spend his cash on other items that may not be found by law enforcement.

      e.      Money launderers and drug traffickers commonly create and maintain books, records, receipts, notes, ledgers, bank records, cashier's checks, and receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the ordering, sale, and distribution of controlled substances, and the outstanding debts and collections from controlled substances that have been distributed as well as to the laundering of proceeds of illegal activities.

      f.      Money launderers and drug traffickers commonly maintain records reflecting names, nicknames, addresses, and telephone numbers of their associates in their illegal operation.

      g.      Money launderers and drug traffickers usually maintain evidence pertaining to their acquisition, conversion, movement, secreting, transfer, concealment and/or expenditure of drug proceeds, such as: currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, purchase agreements, automobile titles, bank statements, and related records, letters of credit, money orders, cashier's checks, safe deposit box agreements and keys, and money wrappers.

      h.      Money launderers and drug traffickers often utilize electronic equipment such as computers, personal digital assistants, cellular telephones, Blackberry e-mail devices, portable memory, telex machines, currency counting machines, and telephone answering machines to generate, transfer, count, record, and/or store the information described in the preceding paragraphs.

      i.      Money launderers and drug traffickers use telephones to facilitate their illegal activities. Records of such telephone calls, including telephone bills are commonly kept

and maintained by the money launderers and drug traffickers. These telephones are often in the primary location of the trafficker's residence.

j.      Money launderers and drug traffickers often take or cause to be taken photographs or video movies of themselves, their associates, their property and assets, and their product. Courts have recognized that unexplained increases in wealth, particularly when this wealth is not reported as income or is in excess of an individual's reported income, and is primarily in the form of cash, is probative evidence of crimes motivated by greed; in particular, illegal activities such as drug trafficking and money laundering.

k.      Money launderers and drug traffickers accumulate and maintain substantial amounts of drug proceeds, specifically currency, over a period of years in order that the proceeds can be utilized in later years for asset acquisitions and/or expenditures during periods when the trafficker is not distributing narcotics or generating new income from laundering.

l.      Money launderers and drug traffickers are not unlike law-abiding individuals in that they maintain historical documents and records reflecting financial transactions and the acquisition of assets for many years. These documents and records will normally be retained for long periods of time regardless of whether their value to the individual has diminished. These documents, including financial records such as records of assets, bank accounts and contact information, are often maintained in the drug trafficker' or money launderers' s residences, automobiles, safe deposit boxes, storage facilities, and other locations that are readily available and controlled by the trafficker. Money launderers and drug traffickers and their associates are known to use aliases, fictitious and multiple addresses, and multiple drivers' licenses in order to conceal their true identity and hinder law enforcement. It is common for money launderers and drug traffickers to maintain records of such identities in secure

location such as their residences (including curtilage), businesses (including curtilage), automobiles, safe deposit boxes, and storage facilities.

m.    Money launderers and drug traffickers who have previously had their assets forfeited often attempt to avoid making the same mistakes that led to forfeiture. Money launderers and drug traffickers often obtain lines of credit, loans, or mortgages to purchase assets that are commonly detected by law enforcement, including items such as cars, boats, motorcycles, and homes. Money launderers and drug traffickers are aware that assets with large liabilities are not often taken by law enforcement.

13.    I know based on my training and experience that Northern California, and in particular Mendocino County, is a drug source area, specifically marijuana.

B.    **Warrant Requested**

14.    This affidavit is submitted in support of applications for search warrant authorizing the search of the following location:

   a.)    87 Warren Street, Randolph, MA 02368, Public Storage, Unit #J021; a storage unit rented in the name of Michel Taunisma, the neighbor of Daphne JEAN;

15.    A full description of the location to be searched pursuant to issuance of the search warrants is attached hereto as Attachment A. A list of items to be seized is attached hereto as Attachment B.

## STATEMENT OF PROBABLE CAUSE

16.    The investigation associated with this application involves Michael GORDON (hereinafter, "GORDON"), Andrean JAGGON, Dagoberto OLEA (who is based in California), Daphne JEAN, Veneta ROWE, Steve GORDON, Monique GORDON, and others. These individuals are under investigation for drug trafficking in violation of Title 21, United States

Code, Sections 841(a) (1) and 846, money laundering in violation of Title 18, United States Code, Sections 1956 and 1957, and structuring in violation of Title 31, United States Code, Section 5324(a)(3). For the reasons set forth in this affidavit, I submit that probable cause exists to believe that the above-mentioned location contains evidence of the above-listed offenses.

17.     On October 16, 2014, a federal grand jury in the District of Massachusetts indicted GORDON, OLEA, and JAGGON for conspiracy to distribute and to possess with the intent to distribute marijuana, and Michael GORDON for structuring. That indictment is currently under seal pending execution of the requested search warrants and the arrests of GORDON, OLEA, and JAGGON.

18.     On November 5, 2014, the Honorable Robert B. Collings, United States Magistrate Judge for the District of Massachusetts, authorized a warrant for the search of four locations in the District of Massachusetts, including 28 Francis Drive, Apartment 11, Randolph, Massachusetts. A true and correct copy of my Affidavit submitted in support of the Application for that search warrant is attached hereto as Exhibit C and incorporated herein by reference as though fully set forth herein

19.     On November 6, 2014, pursuant to the search warrant agents searched 28 Francis Drive, Apartment 11, Randolph, MA, the residence of Daphne JEAN. Among the items found were numerous documents and a plastic bag containing a green leafy substance, which field tested positive for marijuana. One such document was a rental agreement for a storage unit, number J021, located at the Public Storage facility at 87 Warren Street, Randolph, Massachusetts. The applicant listed on the rental agreement was a "Michel Taunisma;" however the alternate contact was Daphne JEAN, which listed her email address as the occupant's email address for electronic communication.

20.     In conjunction with the execution of the search warrant at JEAN's residence,

agents located JEAN at her place of employment, Tufts Medical Center, to discuss the search warrant and her relationship with GORDON. JEAN was a read her constitutional rights pursuant to the Miranda Decision and agreed to answer questions presented to her. JEAN described her relationship with GORDON as a friend; however, she acknowledged that their relationship was romantic at one time. JEAN stated she was aware that GORDON was seeing another woman, Andrean JAGGON.

21.     JEAN was asked about the apartments rented by her in Norwood and Taunton (as discussed in greater detail in Attachment C). JEAN denied renting the apartments for GORDON for the purpose of shipping parcels of marijuana. JEAN stated she rented the apartment at 250 Engamore Lane, apartment 106, Norwood, Massachusetts, because she needed an apartment and could not get out of a previous rental agreement. (As set forth in greater detail in Attachment C, on or about October 25, 2012, the Norwood Police Department seized from that apartment three parcel containing marijuana that had been shipped by GORDON from California, and at the time of the seizure the apartment (which had been rented by JEAN on October 2, 2012) was empty of furniture.) JEAN stated she rented the apartment at 103 Hart Street, Building 5, Apartment 106, Taunton, MA, for a friend, whom she refused to identify. JEAN stated her friend had poor credit and needed assistance. (As set forth in greater detail in Attachment C, JEAN rented the Taunton apartment on July 12, 2013 (with a one year lease), and GORDON shipped several packages to that apartment from California between August 2013 and February 2014. JEAN terminated the lease early, in February 2014, and an employee of the leasing company positively identified GORDON as the individual who returned the apartment keys.)

22.     JEAN denied having any knowledge of GORDON's activities and acknowledged she felt like she was being used by GORDON. JEAN also denied knowing if GORDON had any storage units.

23.     On November 25, 2014, an administrative subpoena was issued and served at the Public Storage Facility, 87 Warren Street, Randolph requesting rental information on Taunisma and storage unit J021. The manager provided a copy of the occupant information sheet which again listed JEAN's email address as a source of contact. The manager also stated that on or about November 16, 2014, the rental applicant, Michel Taunisma, came in and requested that his unit's lock be cut off due to the key being lost. I observed the storage unit and found that it had a MasterLock style lock affixed to it, not a lock provided by Public Storage.

24.     On December 3, 2014, Special Agent Michael Balestra and I re-interviewed JEAN at her apartment, located at 28 Francis Drive, apartment 11, Randolph, Massachusetts. JEAN consented to the interviewed but requested a friend, whom wanted to remain unidentified, to sit in on the interview. JEAN stated that she really loved GORDON but was aware of his other girlfriends, including JAGGON. JEAN stated she has been with GORDON for three years but feels like GORDON lives a second life and that he (GORDON) has used her.

25.     JEAN again denied renting the Norwood and Taunton apartments for GORDON and even stated GORDON never even had keys to the apartments. When JEAN was told that GORDON did in fact have keys to the apartment, particularly in Taunton, she stated she did not remember giving him a key to Taunton, even though he (GORDON) returned the keys to management when she broke the lease. JEAN re-iterated that she rented the apartment in Taunton for a friend who she still would not identify. JEAN at first denied paying the rent for the apartment in Taunton but later changed her statement by stating the friend gave her the money for the rent and she (JEAN) would pay the monthly rent. JEAN stated it would have looked strange if her friend had paid the rent when her name was not on the lease.

26.     JEAN was asked about her current neighbors in the apartment complex and she stated that she was friendly with them but made no acknowledgement about being friends with

15

any of them. JEAN stated that none of her neighbors have talked to her about the search warrant that was executed at her apartment.

27.     After speaking with JEAN, Special Agent Michael Balestra and I contacted Mr. Taunisma regarding to the storage unit. Mr. Taunisma was asked if he had a storage unit and he stated that he did not. Mr. Taunisma pointed toward JEAN's apartment and stated that she (JEAN) asked him to put a storage unit in his name for her. Mr. Taunisma stated JEAN told him that she just wanted to put something in there. Mr. Taunisma stated that JEAN recently asked him to close the storage unit.

28.     I showed Mr. Taunisma the rental agreement and asked if the signatures were his and he stated they were. Mr. Taunisma stated opening the storage unit was a favor for JEAN; he stated that JEAN had driven him to the airport so he felt obligated to rent the storage unit for her. Mr. Taunisma stated JEAN paid for the unit monthly and that he had nothing stored in that unit. Mr. Taunisma stated he went to the facility recently to sign some paperwork in order to have the lock removed, because JEAN had informed him that the key had been lost. Mr. Taunisma stated that he had not yet received the key for the new lock from Public Storage.

29.     Mr. Taunisma provided consent to search the unit and signed a consent-to-search form indicating as much. However, without the key, neither he nor agents could not access the unit. I asked Mr. Taunisma if he knew JEAN's boyfriend, and he stated he has seen him and described him as a light skinned, bald, Jamaican man. It should be noted that JEAN called Mr. Taunisma while Special Agent Balestra and I were speaking with him.

30.     After speaking to Mr. Taunisma, Special Agent Balestra and I went to the Public Storage Facility and observed that Public Storage had not yet changed the lock, and that the same MasterLock style lock was still affixed to the storage unit. I also spoke with the manager of the Public Storage facility, who informed me that they had not yet changed the lock on the unit.

31.    Of note, I learned in response to a subpoena served upon Public Storage that Michaela Gordon, GORDON's daughter, rented a storage unit at the same Public Storage facility from February 13, 2013, until May 27, 2014. Public Storage confirmed that GORDON paid the rental fees for that unit (he was also observed on surveillance going to the Public Storage facility, apparently to pay the rental fee). JEAN (in Mr. Taunisma's name) rented the unit in question here (unit J021) beginning May 11, 2014.

## CONCLUSION

32.    Based on the facts described herein and in Attachment C, I believe that there is probable cause to believe that currently located within the location described in Attachment A, is evidence (as described in Attachment B) relevant to money laundering in violation of Title 18, United States Code, Sections 1956 and 1957, structuring in violation of Title 31, United States Code, Section 5324(a)(3), and drug trafficking in violation of Title 21, United States Code, Sections 841(a)(1) and 846. Accordingly, I respectfully request that this Court issue search warrants authorizing the search of the location described in Attachment A.

I declare that the foregoing is true and correct.

Richard Atwood
Special Agent
Homeland Security Investigations

. DEC - 5 2014
Subscribed and sworn to before me this _____ day of December, 2014.

HONORABLE ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

## ATTACHMENT A

### (Description of premises to be searched)

The premises located at 87 Warren St., Unit J021, Randolph, Massachusetts, is a Public Storage Unit Facility. The single story business building is more fully described as a white building with a gated area where the outdoor storage units are located. Unit "J021" is located in the back portion of the gated area. Unit "J021" is a five foot by five foot storage unit. The numbers "21" are black in color painted on the wall, on the right side of the storage unit door. The letter "J" is also painted black in color painted to the wall at the end of the storage building. The storage unit door is tan in color and opens like a garage door.





ATTACHMENT B

(Items to be seized)

1.     FINANCIAL RECORDS: All financial records of or relating to Michael GORDON, Andrean JAGGON, Dagoberto OLEA a.k.a. Dagoberto Abad OLEA Lopez, Daphne JEAN, Veneta ROWE a.k.a. Veneta MORRIS a.k.a. Veneta MORRIS-ROWE, Steve GORDON a.k.a. Steve K. GORDON a.k.a. Steven GORDON, Monique GORDON a.k.a. TERRELONGE, Mike's Auto Sales and Repair, the GLENFORD FAMILY TRUST, LLC, the CAMMILA FAMILY TRUST, LLC, MYSTIQUE INSURANCE GROUP LLC, MONIQUE GORDON INC., STEVE GORDON LLC, MYSTIQUE REALTY, INC., MYSTIQUE REALTY GROUP LLC, MYSTIQUE HOMES INC, DREAMWORKS MORTGAGE LLC, and their nominees, assignees, or co-conspirators, including but not limited to financial statements, balance sheets, income statements, cash flow statements, ledgers, journals, accounts receivable, accounts payable, leases, bank statements, deposit tickets, deposit items, checks, checkbooks, check registers, passbooks, money orders, cashier's checks, official checks, bank drafts, wire transfer instructions and receipts, withdrawal slips, credit memos, debit memos, signature cards, account applications, automatic teller machine receipts, safe deposit box applications, safe deposit box keys, credit card statements, charge slips, receipts brokerage statements, buy and sell orders and other items evidencing the obtaining, secreting, transfer, or concealment of assets and the obtaining, secreting, transfer, concealment, or expenditure of money.

2.     REAL ESTATE RECORDS: All real estate records reflecting real estate purchased, sold, under contract or consideration to purchase by Michael GORDON, Andrean JAGGON, Dagoberto OLEA a.k.a. Dagoberto Abad OLEA Lopez, Daphne JEAN, Veneta ROWE a.k.a. Veneta MORRIS a.k.a. Veneta MORRIS-ROWE, Steve GORDON a.k.a. Steve K. GORDON a.k.a. Steven GORDON, Monique GORDON a.k.a. TERRELONGE, Mike's Auto

Sales and Repair, the GLENFORD FAMILY TRUST, LLC, the CAMMILA FAMILY TRUST, LLC, MYSTIQUE INSURANCE GROUP LLC, MONIQUE GORDON INC., STEVE GORDON LLC, MYSTIQUE REALTY, INC., MYSTIQUE REALTY GROUP LLC, MYSTIQUE HOMES INC, DREAMWORKS MORTGAGE LLC, and their nominees, assignees, or co-conspirators, including but not limited to loan applications, notes, mortgages, warranty deeds, trust deeds, contracts, agreements to purchase, real estate settlement sheets, appraisals, closing documents, or promissory notes.

3. All records reflecting the purchase, sale, lease, rental, or acquisition of a lien or ownership interest in 11561 NW 36th Street, Coral Springs, Florida; 5665 NW 88th Terrace, Coral Springs, Florida; 1565 SW Paar Drive, Port St. Lucie, Florida; 4 Garden Street, Randolph, Massachusetts; 28 Francis Drive, Apartment 11, Randolph, MA 02368; 5300 Washington Street, Apt 67, West Roxbury, Massachusetts; 99 Florence Street, Apt. 506, Malden, Massachusetts; 3807 Stearns Hill Road, Waltham, Massachusetts; 250 Engamore Lane, apartment 106, Norwood, Massachusetts; 103 Hart Street, BLD-5, Apt 106, Taunton, MA; 805 North Street, Randolph, MA 02368, Public Storage, Unit #556; 1440 Coral Ridge Drive, B313, Coral Springs, FL 33071; and 12121 NW 23rd Manor, Coral Springs, Florida; including but not limited to loan applications, notes, mortgages, warranty deeds, trust deeds, contracts, agreements to purchase, real estate settlement sheets, appraisals, closing documents, promissory notes, lease agreements, and financial documents (including but not limited to personal checks, bank checks, cashiers checks, money orders, wire transfers, and bank statements) evidencing the payment of earnest money, down payments, mortgage payments, rental payments, lease payments, or other payments related to the purchase or rental of said properties.

4. Items showing unexplained wealth or evidencing the proceeds derived from illicit drug trafficking, including but not limited to large sums of money, expensive vehicles, financial

instruments, precious metals, jewelry, and real estate, and documents evidencing the procuring or leasing of these items.

5.    ADDRESSES AND TELEPHONE NUMBERS: All documents reflecting addresses or telephone numbers of Michael GORDON, Andrean JAGGON, Dagoberto OLEA a.k.a. Dagoberto Abad OLEA Lopez, Daphne JEAN, Veneta ROWE a.k.a. Veneta MORRIS a.k.a. Veneta MORRIS-ROWE, Steve GORDON a.k.a. Steve K. GORDON a.k.a. Steven GORDON, Monique GORDON a.k.a. TERRELONGE, Mike's Auto Sales and Repair, the GLENFORD FAMILY TRUST, LLC, the CAMMILA FAMILY TRUST, LLC, MYSTIQUE INSURANCE GROUP LLC, MONIQUE GORDON INC., or their co conspirators, and items tending to identify co-conspirators including but not limited to telephone records, telephone books, address books and listings, letters, cables, telegrams, telephone bills, mail, pictures, ledgers, receipts and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities, and electronic materials reflecting names, addresses or telephone numbers including cellular telephones and other electronic means of storing such information.

6.    TRAVEL DOCUMENTS: All documents evidencing or relating to foreign or domestic travel of Michael GORDON, Andrean JAGGON, Dagoberto OLEA a.k.a. Dagoberto Abad OLEA Lopez, Daphne JEAN, Veneta ROWE a.k.a. Veneta MORRIS a.k.a. Veneta MORRIS-ROWE, Steve GORDON a.k.a. Steve K. GORDON a.k.a. Steven GORDON, Monique GORDON a.k.a. TERRELONGE, or their co conspirators, including but not limited to airline tickets, tickets for other means of transport, credit card receipts, travel vouchers, hotel receipts, restaurant receipts, gas receipts, notes, schedules, other receipts evidencing travel, boarding passes, itineraries, luggage tags and receipts, frequent flyer statements and awards, car rental receipts and statements, photographs of travel locations, maps, written directions to a location,

23

visas, passports, United States and foreign customs declaration receipts and forms.

7. PHOTOGRAPHS: Photographs of the above-named individuals, their co-conspirators or assets.

8. NEGOTIABLE INSTRUMENTS: All negotiable instruments including United States currency if found in aggregate of $5,000 or more, financial instruments, stocks, and bonds.

9. STORAGE UNIT RECORDS: All records reflecting the ownership or control of storage units including keys, contracts, leases, payments, and inventories.

10. CELL PHONES: All names, words, telephone numbers, email addresses, time/date information, messages or other electronic data in the memory of any mobile telephone and described as the mobile telephone's:

    a. Incoming call history;

    b. Outgoing call history;

    c. Missed call history;

    d. Outgoing text messages;

    e. Incoming text messages;

    f. Draft text messages;

    g. Telephone book;

    h. Data screen or file identifying the telephone number associated with the mobile telephone searched;

    i. Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched;

    j. Voicemail;

    k. User-entered messages (such as to-do lists);

    l. Photographs; and

m.      Any passwords used to access the electronic data described above.

It is specifically requested that the searching agents or officers be authorized to answer and record all telephone calls (residential and/or cellular) received at the location to be searched during the execution of the search warrant, to seize any and all answering machines, pagers and cellular phones, of and to record and return any incoming pages or text messages received at the location to be searched during the execution of this search warrant.

11.      COMPUTERS AND ELECTRONIC MEDIA: Any and all electronically stored data regarding the evidence sought in categories 1-10 hereof, including any and all electronic devices, media, and/or computer hardware equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data.

a.      As used above, the terms records, documents, programs, applications, or materials includes records, documents, programs, applications, or materials created, modified or stored in any form, including electronically.

b.      In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

i.      Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.

ii.      If the computer personnel determine it is not practical to perform an on-site search of the data within a reasonable amount of time, then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory

25

for review. The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

iii. In searching the data, the computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein. In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

iv. If the computer personnel determine that the data does not fall within any of the items to be seized pursuant to this warrant or is not otherwise legally seizable, the government will return these items within a reasonable period of time not to exceed 60 days from the date of execution of the warrant. If the government needs additional time to determine whether the data falls within any of the items to be seized pursuant to this warrant, it must obtain an extension of the time period from the Court within the original sixty day period.

c. In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

i. Any computer equipment and storage device capable of being used to commit, further or store evidence of the offense listed above;

ii. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

iii. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD ROMs, CD-R, CD-RWs, DVDs, optical

disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants and Blackberry devices;

   iv. Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software.

   v. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

   vi. Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

   vii. Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

  12. Articles of personal property tending to establish the identity of person in control of the premises searched, including but not limited to personal identification papers, utility bills, telephone bills, leases, rental agreements, rent receipts, mail, photographs, and keys.

  13. Books, records, receipts, notes, identification documents, and other items evidencing or relating to the acquisition or use of alias identities.

ATTACHMENT C