UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.     ) | Crim. No. 14-CR-10304-DPW |
| ) | |
| MICHAEL GORDON,  ) | |
| ) | |
| Defendant.   ) | |

**OPPOSITION TO DEFENDANT'S MOTION FOR REVOCATION
OR AMENDMENT OF ORDER OF DETENTION**

Defendant Gordon has filed a Motion to for Revocation or Amendment of the Court's December 22, 2014 and February 12, 2015 Orders of Detention. Magistrate Judge Collings and Magistrate Judge Cabell found that the defendant is a flight risk, and that no condition or combination of conditions of release will reasonably assure his continued appearance at these proceedings. Their reasoning was sound and supported by more than sufficient evidence.

Factual and Procedural Background

On October 16, 2014, defendant Gordon and two other defendants (Andrean Jaggon and Dagoberto Olea) were indicted by a federal grand jury in the District of Massachusetts for conspiracy to distribute and to possess with intent to distribute 1000 kilograms or more of marijuana, in violation of 21 U.S.C. §§841(a)(1) and (b)(1)(A)(vii), and Gordon was individually indicted (in the same document) with two counts of structuring in violation of 31 U.S.C. §5324(a)(3).[1] The indictment was the result of an ongoing investigation that revealed that Gordon was obtaining marijuana from Olea in Northern California and shipping it via Express Mail and Federal Express

---

[1] The government has informed all defendants and the Court that its investigation is ongoing, and that it intends to seek a superseding indictment adding additional charges related to money laundering, and potentially additional defendants as well.

to the Boston, Massachusetts area, where he then resold it. *See* December 22, 2014 Memorandum and Order of Detention Pursuant to 18 U.S.C. §3142(e) at 6 (referencing sworn affidavit of HSI SA Richard Atwood of November 5, 2014 (Dkt. 14), and SA Atwood's live testimony over the course of several detention hearings).

Gordon shipped at least 300 packages of marijuana in this manner, for a conservative estimate of over 2900 pounds of marijuana. Based upon the prevailing price for a pound of marijuana in Northern California (where Gordon obtained the marijuana), and in the Boston area (where Gordon sold the marijuana), SA Atwood calculated (and the Magistrate Judges found) Gordon would have seen a profit of approximately $11,600,000 from the sale of that marijuana. Arbitrarily reducing that estimate by 50% in order to reach an even more conservative estimate, Gordon would have received close to $6 million in profits. Deducting $1 million for the cost of flying to California to obtain the marijuana, transporting the marijuana to Boston, etc. (even though such costs would undoubtably have been less), and deducting the $1 million in cash the government was able to trace (through Gordon's financial records) to California to purchase the marijuana, it appears that by even a conservative estimate Gordon retained at least $3 million to $4 million in marijuana profits. *See id*. at 6-7.

On Thursday, November 6, 2014, the government executed search warrants at the Gordon's residence at 4 Garden Street in Randolph, MA, his business (Mike's Auto Body and Repair) in Massachusetts, his mother's house in Florida, his brother's house in Florida, and other locations in Massachusetts and Florida. At the same time, the government filed *lis pendens* against three properties purchased by Gordon (in the names of trusts that he established to launder drug proceeds) in Massachusetts and Florida: his residence in Randolph, MA (which he purchased for $330,000 cash in August 2013 in the name of one of the trusts); his four-unit residential property located at

11561 NW 36th Street, Coral Springs, FL (which he purchased using another trust for $370,000 in April 2012); and his single-family property located at 5665 NW 88th Terrace, Coral Springs, FL (which he purchased using one of his trusts for $368,000 in June 2012, and which he owned free and clear (mortgage fully paid off) by November 2014). The government provided evidence in the form of sworn testimony from SA Atwood's affidavit and live testimony at Gordon's detention hearings that each of these properties was purchased with drug proceeds generated by Gordon's marijuana distribution operation, and that they were purchased as part of Gordon's efforts to launder his drug proceeds. *See, e.g.*, Atwood Affid. (Dkt. 14), at 27-33.

On the same day (November 6, 2014), Gordon was arrested in the instant matter and made his initial appearance before Magistrate Judge Collings. Gordon (accompanied by counsel) was interviewed by Pretrial Services, and a report recommending detention was prepared by Pretrial Services. The following Wednesday, on November 14, 2014 (Tuesday, November 11th, was Veterans Day, a federal holiday), the Court held the first of four detention hearings and (as noted) heard evidence in the form of sworn testimony from HSI Special Agent Richard Atwood. At the November 14th hearing, SA Atwood's Affidavit (Dkt. 14) and the report prepared by Pretrial Services were both accepted into evidence by the Court without defense objection. In addition to the information noted above, those submissions also provided the Court with evidence of the following:

- Gordon has been charged with a serious drug trafficking offense that carries a mandatory minimum prison sentence of ten years and up to life imprisonment;

- Gordon made between $6 million and $12 million from the sale of marijuana during the course of the charged conspiracy;

- Gordon expended vast amounts of cash derived form the sale of marijuana during the conspiracy, including the purchase of his home in Randolph, MA, for $330,000 in cash and the

3

purchase of additional properties in Florida;

- On the date of Gordon's arrest, a search warrant executed at his mother's residence in Florida revealed a safe containing approximately $273,000 in cash; Gordon's mother and Gordon's brother stated that the safe and the money contained therein belonged to Gordon;

- On the same date, approximately 20 pounds of marijuana and approximately $37,000 in cash were found in Gordon's residence at 4 Garden Street, Randolph, MA;

- On the same date, approximately $23,000 was seized from an account held by the Glenford Family Trust, one of the trusts created and controlled by Gordon to launder drug proceeds by purchasing real properties;

- An unloaded 9mm handgun and a fully loaded magazine were found in a bag under Gordon's bed in his residence; the gun was not locked or secured in any way;

- Gordon is not licensed to possess a firearm by the State of Massachusetts;

- Gordon's passport was not found at his residence or at any of the other locations searched;

- Gordon was born in Jamaica and immigrated to the US as a young man, and he maintains ties with his family in Jamaica;

- Gordon's mother owns property in Jamaica;

- Gordon's family informed searching agents that Gordon owns property in Jamaica;

- Documents seized from Gordon's residence revealed that Gordon's girlfriend and co-defendant Andrean Jaggon (with two other individuals) owns property in Jamaica;

- During his interview with Pretrial Services Gordon refused to answer questions regarding his finances;

- During the interview Gordon stated that he is the owner and operator of Mikes Auto

4

Sales and Repair, and that part of his business is purchasing and selling high-end automobiles; SA Atwood testified that Gordon stated the same to him during an interview in 2012;

• Gordon told Pretrial Services that he did not have any employees at his business; in fact, he employed an individual named Angel, whom SA Atwood testified agents observed (via pole camera) working at the business every day;

• Gordon told Pretrial Services he could not recall how much money he had made from his business the previous month, or how much his business was worth;

• Gordon likewise did not know what his car was worth; Gordon told Pretrial Services (and SA Atwood testified) that Gordon owns a 2013 Acura MDX free and clear;

• SA Atwood testified (and his Affidavit detailed) that examination of bank records for accounts held by Gordon and Mike's Auto Sales and Repair revealed that GORDON had deposited almost $2,000,000 into his personal bank accounts and the Mike's Auto Sales Account since January 2010, with the vast majority moving through the Mike's Auto Sales account. The examination reveal few deposits of the type one would expect to see at that type of business (such as checks, and payments from auto insurance companies), instead showing the majority of deposits made to the business' bank account consisted of round-number cash deposits often in amounts (individually or cumulatively) just below the CTR reporting threshold;

• SA Atwood testified that he was not aware of any records of car sales made by Gordon or Mike's Auto Sales and Repair, and that he had located no Form 8300s filed by either Gordon or Mike's Auto Sales and Repair evidencing car sales;

• SA Atwood testified (and his Affidavit detailed) that via live surveillance and pole camera surveillance, he had observed that Mike's Auto Sales and Repair did little business, displayed no cars for sale, and did not do nearly enough business to account for the amount of money that

5

moved through its bank account;

- During his interview with Pretrial Services, Gordon either did not recall or would not say when he had last traveled outside the US or where he had gone; SA Atwood testified that Gordon had traveled to the Turks and Caicos only one year before (in 2013);

- During the same interview, Gordon claimed that he did not know the addresses or locations of his family in Florida, including his mother (where agents found his safe containing $273,000);

- SA Atwood testified (and is Affidavit detailed) that one of the means by which Gordon laundered drug proceeds was via the provision of a $30,000 "loan" to his brother (Steve) and sister-in-law (Monique) in 2012 for the purchase of their home in Florida (at 1565 SW Paar Drive, Port St. Lucie, FL);

- SA Atwood testified on cross examination that Gordon's mother traveled to Jamaica in July 2013 and again in July 2014, and that she informed Customs that while in Jamaica she stayed at "their" home.

Following the November 14th hearing, on November 17, 2014, Pretrial Services interviewed Gordon's daughter, Michaela Gordon. A Pretrial Services Report was prepared of the interview, and the report and additional testimony from SA Atwood were accepted by the Court at the subsequent detention hearings. That report and testimony revealed the following:

- The defendant's daughter Michaela, 22 years old, told Pretrial Services she is a full-time student with an 8 month old (as of November 2014) daughter, and that she works part-time with Blue Cross Blue Shield;

- She informed Pretrial Services that she has never lived outside of Massachusetts, and that she lived at her mother's house (Violet Gordon, one of the proffered sureties) until very recently,

6

when she moved in with her sister in Quincy, MA;

- SA Atwood testified that Gordon was seen engaging in what SA Atwood believed to be drug trafficking activity at Violet Gordon's address, and trash runs revealed boxes with marijuana residue discarded from the residence. According to Michaela Gordon, she was a resident of Violet Gordon's house when these activities were observed, indicating that she may have had knowledge of her father's drug trafficking activities at Violet Gordon's house;

- Although Ms. Gordon claims to have resided at all times in Massachusetts, a search of department of motor vehicles records produced two different State of Florida driver's licences issued to Ms. Gordon;

- A similar search revealed that defendant Gordon also possesses a State of Florida driver's license;

- In November 2013, Gordon addressed at least one package from California (which the government alleges contained marijuana) to Michaela Gordon, and Ms. Gordon contacted FedEx to inquire about the package when it failed to arrive as expected (due to heavy winter storms delaying transportation).

At each of the 4 detention hearings held in this matter, the defendant offered one or more of the sureties and properties he offers now, individually or in combination. Having considered all of the proposed sureties, properties, and combination of conditions proffered by Gordon, Magistrate Judge Collings found the proposals submitted by Gordon were insufficient, and that the Government had proven by a preponderance of the evidence that no condition or combination of conditions would reasonably assure Gordon's presence at these proceedings. Detention Order at 4. The Court began by noting that Gordon was charged with a serious drug trafficking offense, and that accordingly, 18 U.S.C. §3142(e)'s rebuttable presumption that no condition or combination of conditions will

reasonably assure the defendant's appearance was applicable to the instant case. *Id*. at 2. The Court found that the evidence against Gordon is "quite strong, it is likely he will be convicted." *Id*. at 4. The Court also noted "Congress's judgment that defendants who have probably committed serious drug felonies are dangerous and pose particularly great risks of flight," *id*. at 3., and gave "great weight to the presumption contained in 18 U.S.C. § 3142(e) because, in [its] judgment, the defendant closely resembles the Congressional paradigm." *Id*. at 8.

Examining Gordon's history and characteristics, the Court found that Gordon's were, "on balance, not conducive to release," particularly in light of his ties to a foreign country (Jamaica, where he has family and where his close family indisputably owns property), the evidence that he has used [his auto] business as a place where he can sell marijuana," his evasiveness with Pretrial Services, "the availability of a passport and the huge amount of money he derived from his criminal activity which has not been accounted for which could be used to finance flight." *Id*. at 4-6. Magistrate Judge Collings stated, "it is manifest that the defendant has access to significant funds with which to flee to a place where he could support himself without having to face the instant indictment." *Id*. at 7.

Following issuance of the Detention Order and reassignment of the case to Magistrate Judge Cabell following Magistrate Judge Collings' retirement, Gordon filed a Motion to Reconsider Court Order of Detention and Renewed Request for Release on Conditions. Dkt. 80. In that motion, Gordon proposed precisely the security and conditions proposed in the instant motion, and took issue with three of Magistrate Judge Collings' findings. Specifically, Gordon challenged Magistrate Judge Collings's findings that Gordon has ties to a foreign country coupled with vast resources to flee; that Gordon gave evasive answers during his interview by Pretrial Services; and the significance of the failure to locate Gordon's passport. On February 12, 2015, Magistrate Judge Cabell heard argument

8

on these matters (and others raised by Gordon during the argument), and rejected Gordon's motion, finding that Gordon represented a risk of flight for which no condition or combination of conditions could be fashioned to reasonably assure his appearance at these proceedings. Dkt. 88 and 89.

## Argument

Magistrate Judges Collings and Cabell correctly found that the preponderance of the evidence demonstrated that Gordon represents a risk of flight and that no conditions can reasonably assure his appearance in this matter.

A.      Gordon's Ties to a Foreign Country

Gordon challenges Magistrate Judge Collings' finding that he possesses ties to a foreign country and lacks substantial ties to Massachusetts, noting that emigrated to the US and the Boston area in 1987, that he was married to Violet Gordon, that he has several children living in the Boston area, and that he owns a business here.  The government presented substantial evidence that Gordon's business is far from legitimate, and in fact serves as a front to launder drug proceeds generated from the sale of marijuana.  Magistrate Judge Collings further found that there was evidence Gordon used his business "as a place where he can sell marijuana." Detention Order at 5. Furthermore, SA Atwood testified that the business has now closed; as a result, it can hardly serve to anchor Gordon to the Boston area.  Furthermore, both Magistrate Judges found that despite Gordon's local family ties, "the main reasons why [Gordon] poses a serious risk of flight are his roots to a foreign country, the availability of a passport and the huge amount of money he derived from his criminal activity which has not been accounted for which could be used to finance flight." *Id*.  As to those factors, Gordon has offered no rebuttal.

Indeed, with regard to Gordon's ties to Jamacia, Gordon admits that he was born there, that he has relatives there, and that his mother, his brother, and his live-in girlfriend Jaggon all own land

9

there. He simply asserts (through counsel, having refused to discuss his finances or property ownership with Pretrial Services) that he, himself, does not own property or a residence in Jamaica. Of course, that self-serving assertion is contradicted by Gordon's mother and brother, both of whom (as related in SA Atwood's sworn testimony at the November 14th hearing) told investigators that Gordon *does* own property in Jamaica. Furthermore, Gordon went to great lengths to hide his ownership of his residence in Randolph, MA, and the two properties in Florida. There is no reason to believe he would not follow the same pattern and use a nominee or another trust to avoid placing ownership of his Jamaican property (or properties) in his own name.[2] Finally, whether or not Gordon personally owns property in Jamaica is not determinative of whether he has strong ties to and support in that country - which, quite clearly, he does in the form of extended family and his immediate family's property interests.

B.  Gordon's Evasiveness During His Interview with Pretrial Services

Magistrate Judge Collings found that Gordon "was somewhat evasive when being interviewed by Pre-Trial Services" and that his statements that he could not remember where he had

---

[2] Indeed, on December 18, 2014, two days after the final detention hearing before Magistrate Judge Collings, Gordon's daughter, Michaela, flew to Jamaica on a flight she booked the afternoon one day before (December 17, 2014). She purchased a round trip ticket with a return date of December 21, 2014, which she extended once she arrived in Jamaica, ultimately returning to the Boston area on December 25, 2014. In total, she paid approximately $900 for the ticket. Declaration of SA Atwood (Dkt 85-1) at ¶ 2. When she returned to the US she told CBP officers that she had been in Jamaica attending legal issues, that she worked at her father's auto care business, and that she lived at 43 Rockdale Street, Mattapan (Violet Gordon's address). *Id*., ¶ 4. Her statements regarding her residence and employment contradict the information she provided to Pretrial Services, in which she claimed in reside with her sister in Quincy and to work for Blue Cross Blue Shield (*see supra* at 6-7). Her sudden and expensive travel to Jamaica on the heals of hearings at which Gordon's possession of property in Jamaica was such a hotly contested issue is highly suspicious, raising the possibility that she made the trip to ensure that ownership records could not easily be traced to Gordon. At the very least, it evidences close familial ties between Gordon's family in Boston and his relatives in Jamaica, particularly where she had just traveled to Jamaica in July with her then-four month old baby. *Id*., ¶ 3.

traveled on vacation in 2013 or where in Florida his parents and brother live "strain credulity." *Id*. at 5. Magistrate Judge Cabell likewise found Gordon's statements troubling, and was not persuaded by Gordon's late-offered explanation that he was merely "forgetful" because of alleged problems with his liver medication.

And rightly so. Nobody could be expected to believe that Gordon could not remember where he had gone of a family vacation only one year before, where his parents and brother in Florida live (particularly since Gordon had over $273,000 in cash hidden in his mother's house and had helped to finance the purchase of his brother's house), that he had an employee at his own business, how much money he had made at that business the month before, how much the business was worth, or even how much his 2013 Acura MDX (which he owned free and clear) was worth.[3]

It seems clear that Gordon gave evasive answers to Pretrial Services in order to maintain secret his cash and other financial resources. This conclusion finds support in the fact that despite challenging the Magistrate Judges' findings, Gordon still has not provided the information he avoided providing to Pretrial Services. He has not stated how much money he made in October 2014, has not provided an estimate of what his business is worth, does not admit having had an employee, and has not even provided an estimate of the value of his car. Indeed, he has provided no greater insight into his finances or what other assets he may have at his disposal. He continues to be just as evasive and disingenuous now as he was then.

Gordon thus does not offer any challenge to the either Magistrate Judge Collings' or Magistrate Judge Cabell's finding that he possesses vast financial resources with which to finance flight. Indeed, he acknowledges that millions of dollars moved through his business and personal

---

[3] Gordon's failure to be able to value his own car is particularly ironic in light of his claim that he earned his millions buying and selling "high end" automobiles from auto auctions.

11

bank accounts, and merely asserts that he is a successful business man. Putting aside the undisputed testimony from SA Atwood that neither the volume nor the type of business observed by law enforcement at the business were sufficient to explain the large amount of money that moved through its account, Gordon has not disputed that he has (quite literally) millions of dollars available to finance his flight.

C. Gordon's "Missing" US Passport

The police were not able to locate either Gordon's or co-defendant Jaggon's US passports during their search of their Randolph residence, raising the inference that they purposefully placed their passports in another, secure location. Gordon's maintenance of a large stash of cash in his mother's house in Florida speaks to his advanced preparations to flee to avoid apprehension by law enforcement; it is not surprising that he would keep his passport similarly secured.

Magistrate Judge Collings noted that at no time during the proceedings before him did Gordon offer to surrender his passport to the Court. Magistrate Cabell was not persuaded that Gordon's current offer to "assent to revocation" of the passport is sufficient to impede his flight. Gordon's possession of an additional license from Florida, and his daughter's similar possession of multiple Florida drivers licenses despite never having lived there (obtained, according to Gordon, for the purpose of defrauding the State of Florida by posing as a resident in order to obtain in-state college tuition), evidences that he may have false or duplicate identification documents to assist his flight. Given his continued lack of candor regarding his foreign travel, his foreign ties, and his assets, there is no reason to credit either his offer or his assertion that he does not now currently possess his US passport (or a Jamaican passport, or some other usable travel document).

D. The Proffered Security Remains Insufficient

The security offered by Gordon remains insufficient to overcome his risk of flight. Each of

the sureties offered by Gordon and the amounts of the bonds each would sign, was previously offered by Gordon at one or more of the previous detention hearings, and all were rejected by the Courts. Magistrate Judge Cabell was presented with precisely the combination of sureties and security offered in the instant motion, and rejected them as insufficient to ensure Gordon would not flee.

On the date of his arrest the government seized over $325,000 in cash from Gordon's home, his safe in Florida, and one of the trusts he controlled. The government also filed *lis pendens* against three of his properties totaling over $1,000,000 in value. Such valuable assets and vast stockpiles of cash point to the real possibility that he maintains additional properties and/or stockpiles of cash that the government has not yet located. Indeed, even the conservative estimate that Gordon earned $6 million from his drug trafficking activities reveals that millions of dollars remain unaccounted for, and Judge Collings noted in his Order that "there is $3,000,000 to $4,000,000 unaccounted for which the defendant could use to finance flight." *Id*. at 7. This figure may or may not include the property *Gordon* seems to own in Jamaica.

The proffered bonds do nothing to change this analysis. Indeed, they do not even equal in value the cash seized from Gordon on the date of his arrest. If released, Gordon could flee the country and, from a safe location, simply give Mr. Gayle $57,000, Ms. Jaggon $30,000, and Ms. Gordon $113,000 from his stockpile of hidden assets to repay the cost of their forfeited bonds. Indeed, Gordon's daughter Michaela's recent sudden trip to Jamaica on the heals of his detention supports the inference that Gordon may have just such a plan already in motion.

For the same reason, a $100,000 bond secured by Gordon's signature is insufficient to overcome his risk of flight. The government has already commenced forfeiture proceedings for Gordon's house in Massachusetts, two of his properties in Florida, and his brother's house in Florida, and is seeking an additional $1 million money judgment. There is no reason to believe that Gordon

13

would in any way be dissuaded from flight by the specter of a $100,000 bond forfeiture that he would only have to consider paying if and when the government was able to locate him and secure his return to the jurisdiction.

Magistrate Judge Collings heard substantial oral testimony, reviewed SA Atwood's detailed affidavit, considered the thorough Pretrial Services Report, and heard lengthy arguments from counsel. Based upon that review he found that "it is manifest that the defendant has access to significant funds with which to flee to a place where he could support himself without having to face the charges in the instant indictment." Detention Order at 7. Magistrate Judge Cabell reviewed the same materials, heard additional argument, and concurred. Their orders were well reasoned and more than supported by the record. The preponderance of the evidence demonstrates that there are no conditions or combination of conditions which will reasonably assure Gordon's appearance, and he should remain detained pending the outcome of these proceedings.

DATED: March 13, 2015

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:   /s/ *Karen D. Beausey*
Karen D. Beausey, CABN 155258
Assistant United States Attorney
United States Attorney's Office
District of Massachusetts
1 Courthouse Way, Suite 9200
Boston, MA  02210
(617) 748-3126
Karen.Beausey@usdoj.gov

## CERTIFICATE OF SERVICE

     I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

DATED: March 13, 2015           /s/ *Karen D. Beausey*
                                           Karen D. Beausey
                                           Assistant U.S. Attorney