UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

v.

MICHAEL GORDON, et al.

Defendants.

No. 14-CR-10304-DPW

**REPORT AND RECOMMENDATION REGARDING DEFENDANT'S MOTION TO SUPPRESS (WARRANTLESS SEIZURES AND INTERROGATION AT AIRPORT) (Dkt. No. 144)**

August 30, 2016

CABELL, U.S.M.J.

On August 11, 2011, Transportation Security Administration (TSA) officials found a large amount of cash in defendant Michael Gordon's carry-on luggage during a routine passenger screening at Logan Airport.  Gordon subsequently made comments to Massachusetts State Police (MSP) Troopers regarding the money and his intended activities, and a canine subsequently brought to the money alerted to the presence of cocaine.  Following a superseding indictment in 2015, Gordon presently faces charges of conspiracy to distribute and possession with intent to distribute marijuana (21 U.S.C. § 846), conspiracy to launder monetary instruments (18 U.S.C. § 1956(h)), and money laundering (18 U.S.C. §§ 1956(a)(1)(B)(i), 1957). Gordon moves to suppress evidence of the currency ($60,000), his statements to law enforcement, and the results of the dog sniff.  After careful consideration of the parties' submissions and the evidence adduced at an evidentiary hearing, I recommend that the motion to suppress be denied.

## I.    FINDINGS OF FACT

Three witnesses testified at an evidentiary hearing held on May 12, 2016, including MSP Sergeant Richard Galeazzi, MSP Trooper John Morris, and the defendant himself.  In addition, Sgt. Galeazzi and the defendant submitted affidavits.  Based on the evidence the Court makes the following findings of fact.

On August 11, 2011, Gordon entered the JetBlue TSA security checkpoint at Boston Logan International Airport.  He was carrying valid identification, a boarding pass for the Boston to San Francisco leg of a round-trip flight, and a small piece of carry-on luggage.

Gordon presented his boarding pass and identification and placed his bag on the conveyor belt in the screening area.  After the bag went through the x-ray machine, the TSA agent operating the machine made Gordon aware that his bag would be opened.  Gordon believed that the TSA agent was acting on the belief that Gordon's bag had "set off" the x-ray machine. Gordon believed that the TSA agent was mistaken, and that it was the bag of another passenger rather than his own that had caused the machine to react.  Gordon objected to the TSA agent opening his bag but the agent opened it anyway.  The TSA agent discovered a large amount cash rolled up in a pair of pants and then called his supervisor.  The supervisor came and examined Gordon's bag and discovered even more money.  In all Gordon's bag contained $60,000.  The money was comprised of six bundles of hundred dollar bills, each bundle bound with elastic bands, concealed in a total of three pairs of pants, with ten thousand dollars in each pant leg.

The supervisor called for assistance from the Massachusetts State Police.  It is not clear whether anyone informed Gordon that he was free to leave but there is no evidence that anyone told him he could not leave.  Anywhere from a few minutes up to 15 minutes passed before Sgt. Galeazzi and Trooper Morris of the MSP arrived in the screening area.  Galeazzi and Morris are

both detectives.  Both were dressed in plain clothes and had no visible weapon.  There was at least one uniformed police officer already at the scene.[1]

Sgt. Galeazzi at the time had 34 years of law enforcement experience.  He and Trooper Morris approached Gordon and identified themselves.  Sgt. Galeazzi asked to see Gordon's identification and boarding pass.  Gordon complied.  Sgt. Galeazzi returned the identification and boarding pass to Gordon.  Sgt. Galeazzi informed Gordon that he was free to go at any time and that he was not required to answer any questions.  Sgt. Galeazzi informed Gordon that they were interested in the source and nature of the currency in Gordon's bag and asked Gordon if he would be willing to answer some questions.[2]  Gordon agreed to speak with him.  During this time period, Gordon's bag remained in the screening area.

The entire conversation between Sgt. Galeazzi and Gordon lasted approximately ten minutes.  Sgt. Galeazzi testified that Gordon appeared calm and that there was nothing unusual about his demeanor.  Sgt. Galeazzi did not raise his voice or touch Gordon during the encounter.  In response to Sgt. Galeazzi's questions, Gordon stated that he was on his way to San Francisco to buy used cars at an auction.  Gordon stated that he owned Mike's Auto Body at 379 Bowdoin Street in Dorchester, MA.  Gordon stated that he bought used cars to resell at his body shop.  He stated that he bought them in San Francisco because they were cheaper there than they are in Boston.  Gordon said he was going to meet someone in San Francisco who was going to take

---

[1] Gordon testified that Galeazzi and Morris wore police uniforms during the encounter.  Given that Gordon apparently encountered a number of uniformed and non-uniformed law enforcement personnel at Logan, it is understandable that he may not have an exact recollection of who wore what.  The Court credits Gordon's testimony that he observed at least one or more uniformed officers, but also credits the testimony of Galeazzi and Morris that both were wearing plainclothes business attire.  Each officer's testimony was consistent with the other's, as well as the Court's own understanding that detectives often do not wear police uniforms when on duty.

[2] Gordon testified that he was not told he was free to leave until the end of the encounter.  The Court credits Sgt. Galeazzi's testimony on this point because the Court found him to be a more credible witness.  Gordon did not testify that anyone told him he could *not* leave the screening area.

him to the auction but he could not identify the person he planned to meet.  Gordon also stated that he did not know where he would stay while in California.

While Sgt. Galeazzi spoke with Gordon, Trooper Morris used his cell phone to request a criminal history check on Gordon.  Trooper Morris testified that he had no real memory of the encounter with Gordon but he could testify as to his typical practice regarding records checks. Typically, Trooper Morris makes record check requests by phone and it takes between one and five minutes to obtain the results.  In this case the records check revealed that Gordon had a previous arrest involving marijuana and was suspected of being a marijuana trafficker.

Sgt. Galeazzi suspected from a totality of the circumstances that the money represented drug proceeds.  Among other things: the money was bundled in a way that was consistent with the practice used by traffickers; people do not generally travel with such large sums of money and when they do it is usually in connection with a drug transaction; Sgt. Galeazzi believed that Gordon had purchased only a one-way ticket a couple of days prior to August 11th, a practice used by individuals transporting narcotics or proceeds to conceal their full travel plans[3]; Gordon was not able to name who he was going to meet or where he was going to stay with in San Francisco; and the records check revealed that Gordon had drug related arrests, including a recent one in California, and was suspected of drug trafficking.  Sgt. Galeazzi determined at that point that he would seize the money as suspected drug proceeds.  He informed Gordon that he was doing so and asked him if he would like to accompany the detectives to the MSP barracks to obtain a receipt.  Gordon declined and opted to continue on his way to San Francisco.  Gordon apparently missed his flight as a result of the encounter but was able to fly out on a different flight later in the day.

---

[3] Gordon avers that he had a round trip ticket.  The Court credits this testimony.  The Court also credits Sgt. Galeazzi's testimony that he *believed* that Gordon had purchased only a one way ticket.

4

Sgt. Galeazzi brought the money back to the MSP barracks.  A trained canine was brought in to sniff the money and alerted to the presence of narcotics.

## II.   ANALYSIS

Gordon seeks to suppress all of "the evidence seized at the airport without a warrant." (Def's Memorandum at p.1).  Broadly speaking, the events that day fall into three phases, including:  (1) the defendant's interaction with the TSA; (2) the period of time between the defendant's interaction with the TSA and the arrival of the MSP; and (3) the defendant's interactions with the MSP.

### A.   <u>The TSA Search of Gordon's Carry-On Luggage</u>

As an initial matter, no one seriously disputes that TSA personnel were entitled to open and search Gordon's carry-on luggage.  "[T]ransit security screenings [are] "administrative" or "special needs" searches, which may be conducted, at least initially, without individualized suspicion, a warrant, or probable cause."  *Ruskai v. Pistole*, 775 F.3d 61, 68 (1st Cir. 2014).  At the airport, luggage is "commonly x-rayed for guns or explosives, and . . . requests at the checkpoint to open the luggage are not uncommon."  *United States v. De Los Santos Ferrer*, 999 F.2d 7, 9 (1st Cir. 1993).  Such "[r]outine security searches at airport checkpoints pass constitutional muster because the compelling public interest in curbing air piracy generally outweighs their limited intrusiveness."  *United States v. Doe*, 61 F.3d 107, 109-10 (1st Cir. 1995).  "In the event the initial x-ray screening is inconclusive as to the presence of weapons or explosives, the luggage may be hand-searched as reasonably required to rule out their presence."  *Id*. at 110.  The inadvertent discovery of evidence of criminal activity in the course of a lawful security search for weapons at an airport checkpoint does not violate the Fourth Amendment. *United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 81-82 (2d Cir. 2002).

Here, Gordon concedes that TSA agents were authorized as part of their duties to examine his luggage without a warrant, even assuming they did so based on the mistaken belief that his bag had set off the detector.  It follows that there therefore is no basis to suppress evidence surrounding the discovery of the money.

### B.  <u>The Time Period Between the TSA Search and the Arrival of the MSP</u>

As noted above, the TSA supervisor contacted the MSP following the discovery of the money and Sgt. Galeazzi and Trooper Morris arrived anywhere from a few up to 15 minutes later.  Gordon contends that once TSA personnel found the money, but failed to find any weapons or explosives, they reached the limits of their authority and were required to let him and his money go.  He argues that the TSA nonetheless required him to stay, and therefore exceeded the scope of the administrative weapons search the TSA was admittedly entitled to conduct.  The government argues that Gordon was not seized following the discovery of the money and was free to go if he wanted.  It argues that even if Gordon's freedom of movement was restricted, any delay was minimal and justified under *Terry v. Ohio*, 392 U.S. 1 (1968).

The evidence on this phase of events is somewhat slight, because no one was able to find the TSA personnel who had interacted with Gordon.  Accordingly, there is no direct evidence as to what TSA personnel told Gordon, if anything, as to whether he was obliged to stay or was free to go.  For his part, Gordon testified that he did not believe he was free to go, but he did not testify that anyone told him he was not free to go.

Assuming *arguendo* that TSA personnel either affirmatively told Gordon that he could not leave pending the arrival of the police, or created an environment in which a reasonable person would not believe he was free to go, there is no issue that that would constitute a seizure. *See e.g., United States v. Acosta-Colon*, 157 F.3d 9, 13 (1st Cir. 1998) (explaining that a

"seizure" occurs when a reasonable person in the suspect's position would have believed he was not free to leave) (quoting *United States v. Streifel,* 781 F.2d 953, 960 (1st Cir. 1986). Notwithstanding the government's argument to the contrary, the facts of this case do not readily show that the TSA had a reasonable articulable suspicion that Gordon was engaged in criminal activity. *See e.g., United States v. Romain,* 393 F.3d 63, 71 (1st Cir. 2004) (A law enforcement officer may conduct a brief investigatory stop if he has a reasonable articulable suspicion that criminal activity is afoot.) The two principal facts known to the TSA personnel were that Gordon attempted to simply have his bag run through the x-ray machine a second time rather than opened and inspected, and the inspection revealed he had a considerable amount of money in it. While those facts might be sufficient to pique one's curiosity, it is not self-evident that they so reasonably signal evidence of criminal activity as to justify further detention and investigation.

It is not necessary to resolve this issue here, however, because the Court finds that Gordon was not detained by TSA personnel pending the arrival of the MSP but, rather, agreed to stay of his own volition. As an initial matter, there is some basis to wonder whether it really took as long as "about 15 minutes" for the MSP to arrive, as Gordon avers. Regardless, the entire interaction with the TSA personnel occurred in an open, lighted area. No TSA personnel was visibly armed. No one asked or required the defendant to move or to go to another area of the airport. The defendant had his identification and boarding pass with him and no one told him that he could not leave. The most reasonable inference from these facts is that TSA personnel asked, but did not compel, Gordon to wait for the MSP to arrive. On these facts, Gordon could have, had he wanted, simply chosen to walk away. That he chose to stay, the Court finds, was his own choice. *See e.g., United States v. Mendenhall,* 446 U.S. 544, 557 (1980) (no seizure

where defendant at airport agreed to accompany agents for further questioning, despite not being

told she was free to go or could leave at any time).

**C.  Gordon's Interactions with the MSP**

Against that backdrop, none of the subsequent events raise any constitutional concerns.

First, the MSP did not violate Gordon's Fourth Amendment right to be free from a warrantless

seizure because he consented to speak with Sgt. Galeazzi.  Not all encounters between

individuals and the police are seizures governed by the Fourth Amendment.  *Mendenhall,* 446

U.S. at 553 ("not every encounter between a police officer and a citizen is an intrusion requiring

an objective justification").  Law enforcement officers do not violate the Fourth Amendment

simply by approaching an individual in a public place and asking him if he is willing to answer

some questions, provided that the person approached is free to decline and go on his way.

*United States v. Drayton,* 536 U.S. 194, 200 (2002) (no seizure when officers question willing

individuals in street or other public place); *Florida v. Rodriguez,* 469 U.S. 1, 5-6 (1984) (no

seizure when officers speak to willing individuals in airports).  A seizure occurs only when a

reasonable person would feel that they were not free to leave, or would not feel free to decline

the officer's requests or otherwise to terminate the encounter.  *Brendlin v. California,* 551 U.S.

249, 255 (2007).

Here, Sergeant Galeazzi testified that he told Gordon at the outset of their encounter that

Gordon was free to leave and did not have to answer any questions.  Gordon nonetheless agreed

to speak with the detectives.  The entire encounter occurred in the passenger screening area, a

public part of the airport, and lasted no more than twenty minutes.  Gordon concedes that he

never told the officers that he wanted to leave.  Gordon argues that he did not feel he was free to

leave without his money but that concern does not affect the voluntariness of his conduct.

Gordon may have been reluctant to leave the screening area without his money but nothing prevented him from doing so.  Even without his money, Gordon still had his boarding pass, identification and the luggage containing his medication -- everything he needed to either leave the airport or board his flight without his money.  Indeed, that is exactly what Gordon chose to do.  *Compare Florida v. Royer,* 460 U.S. 491, 501, 504 (1983) (holding that defendant was not free to leave where police officers at airport retained his ticket and driver's license and asked him to accompany them to the police room, but noting that officers could have "obviated any claim that the encounter was anything but a consensual matter" by returning the ticket and license and telling defendant he was free to go).  In short, Gordon consented to speak with Sgt. Galeazzi and was never seized for Fourth Amendment purposes.  As a result, there is no basis to suppress any of Gordon's statements to the police.

In turn, Gordon's statements coupled with the result of Trooper Morris' records check gave the police probable cause to seize Gordon's money on the ground that it was connected to drug activity.  The Supreme Court has called probable cause "a flexible, common sense standard [that] merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such belief be correct or more likely true than false."  *Texas v. Brown*, 460 U.S. 730, 742 (1983).  Here, Gordon had carefully concealed a very large amount of cash in his carry-on bag.  He told the officers that he was going to San Francisco, a city Sgt. Galeazzi knew to be in a known drug source area.  Gordon's stated reason for having so much money and traveling to California seemed suspicious to Sgt. Galeazzi in light of the costs associated with transporting cars back to Massachusetts and Gordon's inability to name who he was to meet with or where he was to stay once in San Francisco.  Additionally,

Trooper Morris called in a records check during the encounter and learned that Gordon had multiple drug related arrests including a recent one in California, and was a suspected drug dealer.  In the Court's view, these factors taken together supported a finding of probable cause to believe that Gordon was traveling to San Francisco with the intent to use the concealed money in connection with a drug transaction.  *See Brown*, 460 U.S. at 742 (probable cause established where facts "would warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime"); *United States v. Marrocco*, 578 F.3d 627, 233-34 (7th Cir. 2009) (seizure of luggage reasonable where owner fit profile of drug courier and responded with nervousness and conflicting answers).  There is no basis to suppress the seizure of the money.

### III.   CONCLUSION

For the foregoing reasons it is respectfully recommended that Gordon's motion to suppress be DENIED.  The parties are hereby advised that under the provisions of Federal Rule of Criminal Procedure 59(b) any party who objects to this recommendation must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 59(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  *See Keating v. Secretary of Health and Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*,

616 F.2d 603 (1st Cir. 1980); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Scott*

*v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *see also Thomas v. Arn*, 474 U.S. 140 (1985).


/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED:  August 30, 2016